**FILED**

NOV 1 3 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **THE EQUAL RIGHTS CENTER**<br>a not-for-profit organization,<br>11 Dupont Circle, NW, Suite 400<br>Washington, DC 20036<br><br>Plaintiff,<br><br>vs.<br><br>**TRAMMELL CROW RESIDENTIAL**<br>**COMPANY**<br>a Texas corporation,<br>Two Buckhead Plaza<br>3050 Peachtree Road, N.W., Suite 500<br>Atlanta, GA 30305<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:07-cv-01231<br>Judge Paul L. Friedman |

**CONSENT DECREE**

## INTRODUCTION

1.  The Equal Rights Center (the "ERC") and Trammell Crow Residential Company ("TCR"), (the ERC and TCR are collectively referred to as the "Parties,"), have agreed to enter into this Consent Decree ("Consent Decree") in order to fully and finally resolve the claims raised by the ERC in its Complaint in this action (the "Complaint"), including, but not limited to, the ERC's allegations that TCR failed to design and construct certain apartment buildings and condominium complexes in accordance with the Fair Housing Act (the "FHA"), 42 U.S.C. § 3604(f)(1), (2) & (3)(C), and failed to design and construct places of public accommodation associated with those apartment buildings and condominium complexes in violation of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12183(a)(1).

2.  TCR has denied the allegations of the Complaint, and ERC recognizes that TCR has represented that it acted in good faith and had no intention to avoid the requirements of the FHA and ADA. Nothing in this Consent Decree constitutes or may be construed as an admission of liability as to the allegations of the ERC, all of which are expressly denied by TCR.

3.  The Parties' mutual, long-term objective in entering into this Consent Decree includes the goals of increasing the total number of residential properties in the United States that are accessible to persons with disabilities, and of enhancing housing industry compliance with accessibility laws.

4.  The Parties agree that this Court has jurisdiction over the subject matter of this action. The Parties further agree that the controversy should be resolved without further proceedings. Therefore, the Parties have consented to the entry of this Consent Decree as indicated by the authorized signatures appearing below. The provisions of this Consent Decree will be binding on the ERC and TCR, their respective subsidiaries and their successors and assigns, for a period defined in paragraph J(1), below.

**It is therefore ORDERED, ADJUDGED AND DECREED that:**

DMEAST #10146135 v2

A.    **FAIR HOUSING PROGRAM**

1.    The Parties mutually envision a long-term collaboration with regard to enhancing housing industry compliance with accessibility laws.

2.    In pursuit of their mutual objective, the Parties have agreed that the ERC will establish a Fair Housing Program (the "Program"), sponsored by TCR, to provide educational and training resources to the multifamily housing industry, including companies and associations, as a means of promoting and achieving compliance with housing non-discrimination requirements for persons with disabilities under federal, state and local laws. The Program will not be involved with advocacy activities.

3.    The Program will be structured as follows:

a.    The Program will be established as a separately defined program within the ERC. Supervision and management of the Program will be the responsibility of the ERC. The ERC will provide staffing for the Program to include participation in the Program by the ERC's Fair Housing Project Manager and one or more individuals responsible for training, communication, and research, respectively.

b.    An advisory committee, consisting of three members appointed by the ERC, a representative of TCR, and a single representative representing all other housing industry companies that subsequently join the Program. Until another company joins, a second representative of TCR will serve on the advisory committee.

c.    The Program will provide various services to member housing industry companies as a group and to individual member companies, generally to be compensated at then-existing fair market rates for services provided to individual company members by the ERC. Services may include training, reviews of policies and practices, and compliance testing to monitor and improve policies and practices of member companies. Some of these services may be provided pursuant to a confidentiality agreement when requested by an individual member company.

4.    TCR agrees to guarantee the funding of the Program in the amount of One Hundred and Fifty Thousand Dollars ($150,000.00) each year for ten years, beginning in 2008. The initial payment under this paragraph will be made via wire transfer to the ERC within 30 days of the entry of this Consent Decree, and subsequent annual payments will be made by the same means within 30 days of the anniversary of this Consent Decree.

DMEAST #10148135 v2

TCR will receive the services set forth in Paragraph A(3)(c) above, including some limited compliance testing, to be agreed upon by the parties, without payment of any additional compensation to the ERC.

5.  The Parties agree that TCR's funding of the Program, as set forth in Paragraph A(4), constitutes payment, in part, of claims for damages because of alleged injuries sustained at multifamily rental properties and condominium properties as to which TCR or TCR-related entities were involved in the design and construction process as an owner, developer, or contractor since March 13, 1991 (the "Consent Decree Properties").

6.  Mr. Ron Terwilliger of TCR and/or his successor, if any, will promote, to the extent he/they determine appropriate exercising his/their discretion, the activities of the Program with industry organizations and multifamily housing developers and solicit them to be members of the Program.

    a.  TCR's guaranteed contribution in any given year will be reduced by one dollar for every $1.50 contributed in that year by housing industry companies other than TCR above a total non-TCR contribution of $150,000, but in no event will TCR's contribution be reduced to less than $25,000 in any given year.

    b.  The level of monetary participation in the Program by any company other than TCR will be subject to the approval of the ERC.

    c.  The Parties further agree that any multifamily housing company may join the Program provided it demonstrates to the satisfaction of the ERC that it has adopted or will, with the ERC's assistance, adopt policies and procedures to ensure compliance with the accessibility provisions of the FHA and ADA applicable to the design and construction of multifamily housing, and it reaches an agreement satisfactory to the ERC. The remediation tolerances agreed to by the ERC and TCR will provide a guide to appropriate remediations, but the parties recognize that each developer's properties and the number, scope and severity of violations will vary, and thus, appropriate remediations will vary as well.

7.  The ERC retains the right to terminate any company's participation in the Program on reasonable notice. If a company's participation, including TCR's participation, is terminated by the ERC, any monetary obligation of the terminated company to the Program, including in the case of TCR the obligation under Paragraph A(4) above, will also terminate.

8.  The Parties agree that the ERC will not initiate any lawsuit or administrative action against TCR or any "TCR-Released Parties" (as defined in Paragraph E(2) below), even upon TCR's termination of

-4-

membership, alleging violations of the design and construction provisions of the FHA with respect to any multifamily properties, in which TCR or any TCR subsidiary or affiliate is or was involved in the design or construction process, for which a building permit was issued prior to entry of this Consent Decree or during TCR's membership in the Program, but that the Parties will instead submit any such matter to the mutually binding arbitration in accordance with the following procedures:

a.   Any dispute, claim, or controversy arising out of or relating to this paragraph, including the determination of the scope or applicability of this paragraph, shall be determined by arbitration in Washington, D.C. before a single arbitrator.  The arbitration will be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures.  The decision of the arbitrator will be enforceable in any court having jurisdiction.

b.   Subject to Paragraph A(8)(c) below , each Party to the arbitration will bear its costs for preparing and participating in the arbitration, including the costs of counsel, experts, and presentation materials. The Parties to the arbitration will share equally the cost of the arbitrator's fees.

c.   At the conclusion of an arbitration, the prevailing party will receive payment of its costs of counsel, experts, and presentation materials as allowed by  the fee-shifting provisions of the FHA, as interpreted by the various federal courts.

d.   Notwithstanding this paragraph, this Consent Decree may be enforced in any court having jurisdiction should either party refuse to honor its obligations hereunder.

e.   The ERC will seek to negotiate similar dispute resolution agreements with other individual company members of the Program.

9.   If a third-party lawsuit or administrative action is brought against TCR, any TCR subsidiary or affiliate, or another housing industry company which is a member and participant in the activities of the Program, the ERC will provide testimony if requested as to the activities of the Program and any affirmative actions to enhance accessibility being taken specifically by TCR or the member by its participation in the Program. The content of such testimony shall be within the discretion of the ERC.

- 5 -

**B.   EDUCATION AND TRAINING**

Within 180 days of the entry of this Consent Decree, TCR will ensure that certain of its employees who are directly involved in the design and/or construction of covered multifamily dwellings, including at least three persons for each TCR division who have control and influence over ensuring compliance with accessibility requirements, attend fair housing training with specific emphasis on compliance with the accessibility requirements of the FHA and ADA, and will secure a signed statement, attached hereto as **Appendix 1**, from each employee acknowledging that he/she has received this training. This training will be provided by the ERC under the auspices of the Program once per quarter at no additional charge to TCR.

**C.   PUBLIC NOTICE OF NON-DISCRIMINATION POLICY**

Within 180 days of the entry of this Consent Decree, the ERC will review and comment on TCR's practices related to public notice of its nondiscrimination policy and nondiscrimination in advertising and will assist TCR in implementing reasonable changes for compliance if any are necessary. This review and assistance will be provided by the ERC under the auspices of the Program at no additional charge to TCR.

**D.   CORRECTIVE ACTIONS FOR CONSENT DECREE PROPERTIES**

1.   Properties Subject To Consent Decree:  TCR represents that it has identified all Consent Decree Properties, as defined in Paragraph A(5) above.

2.   Properties Subject to Remediation:  Those Consent Decree Properties that are multifamily rental properties owned by a TCR-related entity as of October 9, 2008, and which were completed on or after January 1, 2005, including those for which a building permit has been issued as of October 9, 2008 and are scheduled to be completed prior to December 31, 2008, are referred to herein as the "Remediation Properties" and are subject to the survey, remediation, and inspection provisions of this section. TCR's remediation obligations are limited to multifamily apartment properties. No condominium properties, defined as properties comprised of 100% condominium units, and no condominium units will be required to be remediated under this Consent Decree unless agreed upon by the Parties. The Remediation Properties are identified in **Appendix 2**.

3.   Initial Surveys of Remediation Properties:

a.   All Remediation Properties will be surveyed by a jointly agreed-upon consultant ("Consultant"). If the Parties are not able in good faith to agree on a consultant, the Parties will each designate a

- 6 -

consultant ("Consultants"). The Consultants will attempt to work cooperatively with each other in providing joint reports. If they are unable to agree, they will notify the Parties of the disagreement and the Parties will resolve the issue in accordance with the dispute resolution terms contained in Paragraphs A(8) and J(3) of this Decree.

b.  Within 90 days of the date of entry of this Consent Decree by the Court, TCR will, in consultation with the Consultant(s), provide the ERC with a schedule of the Initial Surveys to be conducted at each of the Remediation Properties.

c.  The Consultant(s), with the cooperation of TCR, will conduct an Initial Survey of each Remediation Property to determine the existence and scope of any deficiencies in compliance with the applicable accessibility requirements of the FHA and the ADA. In determining the existence of such deficiencies, unless otherwise agreed to, the Consultant(s) will apply the requirements of Paragraph D(4)(a) below.

d.  The Consultant(s) will provide the Parties with a written report of each Initial Survey within 14 days of the completion of that survey.

e.  The Consultant(s) and TCR will use their best efforts to complete all such Initial Surveys within twelve months from the date of entry of this Consent Decree.

f.  TCR and/or the ERC may, at their own individual expense, designate a representative(s) to observe such Initial Surveys as they deem appropriate.

g.  Subject to Paragraph D(3)(f), all expenses related to the Initial Surveys will be borne by TCR.

h.  Within 30 days of receipt of the Initial Survey report for each Remediation Property, the Parties will make a good faith effort to agree on the alterations, if any, to be made in that Property ("Property Alteration Agreement") in accordance with the provisions of Paragraph D(4) below. Each Property Alteration Agreement will detail the Parties' understandings regarding the alterations to the covered dwelling units and the common use and public use areas of the Remediation Property so as to bring the Property into compliance as discussed in Paragraph D(4) below (the "Alteration"). A "form" Property Alteration Agreement is provided at **Appendix 3.**

- 7 -

    i.     The Parties will endeavor in good faith to resolve informally any issues regarding the terms of Property Alteration Agreements and TCR's compliance therewith prior to bringing the issues to the Court for resolution.

4.    Remediation: TCR agrees to cause its affiliates and subsidiaries to provide certain accessibility remediation at the Remediation Properties (including the public and common use areas and individual units). The accessibility remediation is subject to the following requirements and limitations:

    a.    TCR will cause each Remediation Property to be altered so as to fully comply with one or more "Safe Harbors"[1] recognized under the FHA and ADA (except as provided for by Paragraph D(7) below).

    b.    TCR's compliance with one or more Safe Harbors is subject to the Remediation Tolerances set forth in **Appendix 4**, and such other requirements or exceptions as may be agreed to by the Parties.

5.    Minimum Remediated Units: Notwithstanding any other provision of this Consent Decree, TCR will survey and remediate as necessary no fewer than 3,500 apartment units or substitute units, as defined in Paragraph D(6), below, during the term of this Consent Decree.

6.    Substitution of Consent Decree Properties:

    a.    TCR will have the right to substitute remediation of any number of covered units in the post-January 1, 2005 units with:

        (i.)    remediation of a comparable number of units in pre-January 1, 2005 properties and/or unsold condominiums completed at any time prior to the entry of this Consent Decree to be in compliance with Paragraph D(4) above.

        (ii.)    to-be-built townhouses or single family homes that include certain agreed-upon accessibility features identified in **Appendix 5**.

---

[1]    "Safe Harbor" means any of the following: a) ANSI A1117.1 (1986); the Fair Housing Accessibility Guidelines (HUD, 1991); the Fair Housing Design Manual (1998); the Guidelines and Supplemental Questions and Answers (HUD, June 28, 1994); CABO/ANSI A117.1 (1992); ICC/ANSI A1171.1(1998); the Code Requirements for Housing Accessibility (CRHA, 2000); the International Building Code (2000, with 2001 Supplement); the International Building Code (2003); the International Building Code (2006); and b) any other Safe Harbor recognized by HUD. To the extent Trammell Crow Residential relies upon ANSI standards as a Safe Harbor, those standards will be read in conjunction with the Fair Housing Act, HUD's regulations, and the HUD Fair Housing Accessibility Guidelines.

- 8 -

      b.   TCR will receive double credit toward its Minimum Remediated Units for remediating any "affordable" pre-January 1, 2005 units. For purposes of this section, "affordable" units are those that are "affordable" in the metropolitan statistical area where the units are located, for families earning at or below 60% of the applicable Area Median Income under the HUD guidelines.

      c.   TCR will receive double credit toward its Minimum Remediated Units for creating appropriately disbursed "super accessible" units not otherwise required by law. For purposes of this section, "super accessible" units are those that are built to comply with the ADA Standards for Accessible Design, Section 9.0, et seq.

      d.   TCR will receive quadruple credit toward it Minimum Remediated Units for remediating and/or creating units that are both affordable and super accessible, as those terms are defined herein.

      e.   Notwithstanding the foregoing provisions, the total number of units to be surveyed and remediated as necessary will not be reduced by more than 25% as a result of the substitution process.

7.     <u>Sale of Remediation Properties:</u>  If any Remediation Property requiring remediation is to be sold to an entity unrelated to TCR, TCR will ensure that at least 25% of the units per year (i.e., 365-day period) after the date of this Consent Decree have been remediated prior to the transfer of ownership of the Remediation Property, which may include unit-for-unit substitutions under Paragraph 6(a) above being provided, and that all of the required common and public areas have been remediated or provision has been made with the buyer to allow TCR to remediate those areas after the transfer of the property consistent with the timing provisions in Paragraph D(8) below. All units substituted under Paragraph D(6)(a), but located in a property being sold by TCR, will be surveyed and remediated as necessary prior to the sale.

8.     <u>Time of Completion of Remediation Activities:</u>  The Parties agree to the completion of the remediations contemplated in this section D as soon as practicable, but in no event later than the following:

      a.   Alterations relating to public use and common use areas will be completed within one year of the execution of an applicable Property Alteration Agreement.

      b.   Alterations relating to the interiors of covered dwelling units will be completed at the time of turnover of occupancy for those units but, in no event, later than 36 months after the execution of the applicable Property Alteration Agreement. Notwithstanding the

- 9 -

foregoing, should any tenant request alterations in his/her unit, TCR will, in addition to completing the requested alterations as required in Paragraph D(9), within 90 days, complete the Alterations called for in the applicable Property Alteration Agreement relating to all common use and public use facilities reasonably affecting that tenant's day-to-day activities.

9.   <u>Actions as to Individual Tenants:</u>

   a.   Within 60 days of the date of the entry of this Consent Decree, TCR will submit a written policy regarding reasonable accommodations and reasonable modifications to the ERC for review, comment and agreement.

   b.   Once the policy is approved by the ERC, in all instances where TCR has the ability to control the decision, the policy will be incorporated into the form lease agreement to be signed by all current tenants at Consent Decree Properties owned by TCR-related entities as of October 9, 2008, upon lease renewal and all future tenants of the property during the duration of this Consent Decree. The lease addendum will be separately read and signed/initialed by each resident, thereby informing each tenant that:

      (i)   a tenant of the Consent Decree Property who has a disability, who becomes disabled during the term of this Consent Decree, or who can demonstrate recurring visitation by persons with a disability may, upon request, have certain features of accessibility and adaptive design which would benefit the resident or the visitor, as determined by agreement of the Parties, retrofitted in the unit to comply with the design standards required by Paragraph D(4); and

      (ii)   the alterations offered will be at no cost to the tenant.

   c.   In any unit that is modified pursuant to this Paragraph D, the inspection and certification requirements of Paragraph D(12) will apply.

   d.   If TCR receives a written or oral request to perform any alterations from a tenant under this Paragraph D(9), TCR will notify the ERC of the request and will commence and complete the retrofits within 90 days from the date of the tenant's request. TCR will create and maintain records of all requests, responses, and alterations completed under this paragraph 9.

- 10 -

e.   In lieu of performing the retrofits required under this Paragraph
D(9), TCR may comply with this paragraph by offering relocation
of the requesting tenant to another unit within the same property
("Relocation Unit"), if:

  (i)    the Relocation Unit is comparable with the requesting
         tenant's unit in layout, features, location, and size;

  (ii)   the Relocation Unit is in compliance with the design
         standards set forth in paragraph D(4);

  (iii)  such relocation is provided at no cost to the requesting
         tenant.

10.   Dislocation of Tenants: TCR will attempt to minimize any dislocation to
current and future tenants caused by the remediations. TCR will
compensate current or future tenants for the cost of temporary housing and
reimbursement of out of pocket expenses caused by the remediation.

11.   No Pass-Through of Costs to Tenants: TCR agrees that no additional rent,
deposit, or other fee may be charged solely because of contemplated or
completed remediations at any Remediation Properties.

12.   Inspection and Certification of Completed Remediations at Properties

a.   The Consultant(s) will be retained by TCR to conduct on-site
inspections of the remediations that have been performed at each
Remediation Property to determine if they have been completed in
accord with the Property Alteration Agreement. Upon completing
the remediations at a Remediation Property, TCR will provide
notice to the ERC and the Consultant(s) (the "Completion
Notice").

b.   Within 21 days after the Completion Notice is sent, and upon not
less than seven days notice to TCR, if reasonably possible, the
Consultant(s) will conduct the on-site inspection. Inspections will
be carried out so as to minimize, to the extent possible, disruption
to tenants.

c.   Within 14 days following each on-site inspection, the
Consultant(s) will set out the results of each inspection, if
reasonably possible, including deviations in compliance with the
Property Alteration Agreement, if any, in writing, and will send the
report to the Parties.

d.   TCR will make a good faith effort to correct any deviations from
the Property Alteration Agreement in all units requiring the same

- 11 -

Alteration within 90 days following receipt of the report from the Consultant. All costs associated with these inspections and any corrections to remedy deviations will be paid by TCR. Upon final completion of the Alterations, and certification by the Consultant, the ERC will provide TCR with a release in the form attached hereto as **Appendix 6.**

e.  If the Consultant cannot complete the inspections in the time provided, reasonable additional time will be permitted.

13.  Future Compliance

TCR, its subsidiaries and its successors and assigns, shall comply with the relevant provisions of the FHA and ADA in connection with the design and construction of their future covered multi-family housing.

E.  **RELEASE**

1.  Remediation Properties: As to each Remediation Property, the ERC releases all claims relating to accessibility under the design and construction provisions of the FHA, the ADA, and any similar state or local accessibility law related to that Remediation Property, except for the obligations under this Consent Decree. The ERC agrees that for each Remediation Property, upon completion of remediation, final inspection and certification by the Consultant(s), the ERC releases TCR and any other TCR - Released Party (as defined herein), from all claims under the FHA, ADA, and any similar state or local accessibility law related to the design or construction of that Remediation Property that were brought or could have been brought as of the date of the release.

2.  All Other Consent Decree Properties: As to all other Consent Decree Properties only, the ERC expressly covenants and agrees to forever refrain from instituting, maintaining, prosecuting, continuing to maintain or prosecute any suit, action or proceeding or assisting others with any suit, action or proceeding against TCR, its subsidiaries and affiliates, and other entities or individuals which have or, in the past, had an ownership interest in the Consent Decree Property in question, or which had a role in the design or construction of that Consent Decree Property, as well as the officers, directors, managers, trustees, employees and agents of such entities or individuals, and the respective successors and assigns of all of those herein, (the "TCR-Released Parties") alleging claims under the FHA and ADA, and any similar state or local accessibility law related to the design or construction of that Consent Decree Property, except related to changes made after the entry of this Consent Decree.

- 12 -

**F.    NEW TRAMMELL CROW RESIDENTIAL MULTIFAMILY RESIDENTIAL PROJECTS**

    1.    For the term of this Consent Decree, TCR will have all future multifamily residential projects designed, constructed, and/or owned by TCR or its subsidiaries or affiliates, except for those projects in which the TCR-related entity for the project is only acting as the General Contractor, reviewed during design and construction by a third-party fair housing and ADA consultant with knowledge and expertise in the requirements of the FHA and the ADA.

    2.    During the term of this Consent Decree, the ERC will review and comment on TCR's program of third-party reviews.

**G.    REPORTING**

In addition to any other reporting and disclosure requirements set forth throughout this Consent Decree, within 180 days after the entry of this Consent Decree, and on the annual anniversary date of the entry of this Consent Decree, TCR will submit to the ERC a report containing a description of TCR's actions in the preceding period to comply with the training, remediation, and other requirements of this Consent Decree.

**H.    PAYMENT TO THE ERC**

In addition to the payments described in Paragraph A(4) of this Consent Decree, TCR will make an agreed-upon monetary payment to the ERC as set forth in a side letter agreement between the Parties. The Parties agree that the payment referenced herein constitutes payment for claims for damages because of alleged injuries sustained at the Consent Decree Properties.

**I.    PRESS RELEASE AND PUBLIC STATEMENTS**

With the mutual goal of disclosing the Consent Decree and the organization of the Fair Housing Program to the public, TCR and the ERC will jointly issue the press release attached hereto as **Appendix 7.**

**J.    MISCELLANEOUS**

    1.    <u>Term of Decree</u>

This Consent Decree will remain in effect for four years and, as to completion of unfinished alterations, longer until such time as final certification of all alterations contemplated hereunder are complete. TCR's obligation for guaranteed funding and participation in the Fair Housing Program shall continue for a total of ten years, except as provided in Paragraph A(7).

- 13 -

2.    <u>Retained Jurisdiction to Enforce Decree</u>

The Court will retain jurisdiction for the duration of this Consent Decree
to enforce the terms of this Decree.  Any party may move the Court to
extend the duration of this Decree for good cause shown.

3.    <u>Dispute Resolution</u>

The ERC and TCR will endeavor in good faith to resolve informally any
differences regarding interpretation of and compliance with this Consent
Decree prior to bringing such matters to the Court for resolution.
However, in the event of a failure by either Party to perform in a timely
manner any act required by this Consent Decree or otherwise to act in
accordance with any provision hereof, which is not subject to the dispute
resolution process in Paragraph A(8), the other Party may move this Court
to impose any remedy authorized by law or equity, including, but not
limited to, an order requiring performance of such act or deeming such act
to have been performed, and an award of any damages, costs, and
reasonable attorneys' fees which may have been occasioned by the
violation or failure to perform.

4.    <u>Time for Performance</u>

The time frames imposed by this Consent Decree for the performance of
certain acts may be extended by the mutual written agreement of the ERC
and TCR without requirement of Court approval.

5.    <u>Notice to the Parties</u>

Notice to the Parties may be given by facsimile (if also mailed by first-
class mail), in which case notice will be deemed to have been received on
the day of transmission, as follows:

If to the ERC:              Executive Director,
                            Equal Rights Center
                            Facsimile:  202-234-3106

                            *and*

                            Director, Fair Housing Project
                            Washington Lawyers' Committee for Civil
                            Rights & Urban Affairs
                            11 Dupont Circle, N.W., Suite 400
                            Washington, D.C.  20036
                            Facsimile:  202-319-1010

- 14 -

If to Trammell Crow
Residential Company :

Tom Patterson
Chief Administrative Officer
Trammel Crow Residential Company
2001 Bryan Street, Suite 3250
Dallas, Texas 75201
Facsimile: 214-922-8536

*and*

Michael W. Skojec, Esquire
Ballard Spahr Andrews & Ingersoll, LLP
300 East Lombard Street
Baltimore, MD 21202
Facsimile: 410-361-8967

6. <u>Reservation of Other Claims</u>

This Consent Decree, and any release hereunder will have no force or
effect with respect to the ERC's claims as against any person or entity
other than the TCR-Released Parties, all such claims have been
specifically reserved by the ERC except as follows. TCR and TCR-related
entities will initially have the sole right to pursue claims against their
design professionals and contractors/subcontractors who performed design
or construction work at any of the Consent Decree Properties. ERC agrees
not to pursue any claims arising out of the Consent Decree Properties and
released properties against any of the design professionals and
contractors/subcontractors unless TCR expressly waives the right to bring
any such claims.

7. <u>Representations</u>

TCR represents that the Remediation Properties identified by TCR
pursuant to Paragraph D(2), and listed in Appendix 2, constitute all of the
Consent Decree Properties that are multifamily rental properties owned by
a TCR-related entity as of October 9, 2008, and which were completed on
or after January 1, 2005, including those for which a building permit has
been issued as of October 9, 2008 and are scheduled to be completed prior
to December 31, 2008.

8. <u>Titles</u>

The titles used in this Consent Decree are non-substantive descriptions
included solely for the Parties' ease of reference and will not be construed
to alter the substantive provisions of this Consent Decree.

- 15 -

9.  **Counterparts**

This Consent Decree may be executed in counterparts, all of which when taken together shall constitute a single instrument.

10. **Integration Clause**

This Consent Decree, including the appendices thereto, constitutes the entire agreement and understanding between the Parties and supersedes all prior communications or negotiations between the Parties and their representatives regarding the matters contained in this Consent Decree. Evidence of prior negotiations (including but not limited to drafts of this Consent Decree and its related documents) may not be introduced in any proceeding to enforce the terms of this agreement. Except as explicitly set forth in this Consent Decree, there are no representations, warranties, promises, or inducements, whether oral, written, expressed, or implied, that in any way affect or condition the validity of this Consent Decree or alter its terms. This Consent Decree may be amended only by a contemporaneous or subsequent written instrument executed by all of the Parties hereto or by approval of the Court. The wording of this Consent Decree was reviewed by legal counsel for each Party, and both Parties had sufficient opportunities to propose and negotiate changes in wording prior to its execution. Neither the ERC nor TCR will be entitled to have any wording of this Consent Decree construed against the other based on any contention as to which of the Parties drafted the language in question.

*Agreed this day,*

THE EQUAL RIGHTS CENTER

By: _____

Peter B. Work
Monica M. Welt
April M. Nelson
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595

Isabelle M. Thabault
Robert M. Bruskin
Mary Hahn
Washington Lawyers' Committee
For Civil Rights and Urban Affairs
11 Dupont Circle, NW, Suite 200
Washington, D.C. 20036

- 16 -

*Attorneys for the Equal Rights Center*

TRAMMELL CROW RESIDENTIAL COMPANY

By: _____
     Michael W. Skojec, Esquire
     Ballard Spahr Andrews & Ingersoll, LLP
     300 East Lombard Street
     Baltimore, MD 21202

     Lanny Breuer, Esquire
     Covington & Burling LLP
     1201 Pennsylvania Avenue NW
     Washington, DC 20004

     *Attorneys for Trammell Crow Residential Company*

*So ordered.*

_____
Judge

November 12, 2008

- 17 -

## LIST OF APPENDICES

| No. | Description |
| --- | --- |
| 1 | Employee Training Acknowledgment |
| 2 | Remediation Properties |
| 3 | Form of Property Alteration Agreement |
| 4 | Remediation Tolerances |
| 5 | Aging in Place Design Features |
| 6 | Form of Release |
| 7 | Press Release |

DMEAST #10146135 v2

## APPENDIX 1

### Employee Acknowledgement

I, _____, an employee of Trammell Crow
Residential Company, or one of its related companies, hereby acknowledge that I have
received fair housing training with specific emphasis on compliance with the accessibility
requirements of the FHA and ADA.


_____
[Employee name]


_____
Date

DMEAST #10146135 v2

## APPENDIX 2

## Remediation Properties

| Property Name | Also Known As | Units | | City | State | Completion Date |
|---|---|---|---|---|---|---|
| Park at Piney Woods | | 188 | apts | Conroe | TX | 4/29/2005 |
| Park at Humble | | 216 | apts | Humble | TX | 6/22/2005 |
| Reserve at Thornton | | 276 | apts | Thornton | CO | 12/7/2005 |
| Reserve at Prospect | | 140 | apts | Denver | CO | 1/19/2006 |
| Park at Woodland Springs | Woodline | 250 | apts | Spring | TX | 5/31/2006 |
| Alexan Pembroke Woods | | 240 | apts | Pembroke | MA | 12/21/2006 |
| Alexan Paradise | | 240 | apts | Peoria | AZ | 5/18/2007 |
| Deveraux Glen | Peterkort | 506 | apts | Portland | OR | 5/31/2007 |
| Alexan Black Mountain | Alexan Nevada State Drive/Wagon Wheel | 213 | apts | Henderson | NV | 2/28/2008 |
| Alexan Back Beach | Beckrich | 360 | apts | Panama City Beach | FL | 8/1/2007 |
| Alexan Main Street | | 286 | apts | Houston | TX | 9/30/2007 |
| Wynhaven Crossing | | 300 | apts | Stafford | TX | 11/7/2007 |
| Alexan Stafford | | 264 | apts | Stafford | TX | 10/31/2006 |
| Alexan Woods | Alexan Springs II | 280 | apts | Houston | TX | 11/30/2007 |
| Alexan Yorktown | Little York | 306 | apts | Houston | TX | 11/30/2007 |
| Alexan Bunker Hill | | 398 | apts | Houston | TX | 12/31/2007 |
| Azure at Lakeville Square | | 147 | apts | Petaluma | CA | 12/31/2007 |
| Alexan Wellborn | | 312 | apts | North Hills | NC | 5/12/2008 |
| Alexan Upper Kirby | | 230 | apts | Houston | TX | 5/31/2008 |
| Wynhaven at Willowbrook | Grant Road | 372 | apts | Houston | TX | 5/31/2008 |
| Artisan on Second | | 118 | apts | Los Angeles | CA | 3/31/2008 |
| Alexan Swenson Farms | | 336 | apts | Austin | TX | 6/30/2008 |
| Alexan Bel Mar | | 307 | apts | Lakewood | CO | 7/11/2008 |
| Alexan Sommerall | | 368 | apts | Houston | TX | 7/31/2008 |
| Alexan Laguna Beach | | 360 | apts | Panama City Beach | FL | 8/31/2008 |
| Hill Country Galleria | Alexan Galleria | 309 | apts | Bee Cave | TX | 9/26/2008 |
| Alexan Sterling Ridge | | 310 | apts | Houston | TX | 9/30/2008 |
| Alexan at Villebois | | 274 | apts | Wilsonville | OR | 4/30/2008 |
| Alexan Post Oak | | 392 | apts | Houston | TX | 10/31/2008 |
| Alexan Panther Creek | | 288 | apts | Cary | NC | 10/31/2008 |
| Alexan Voss | | 376 | apts | Houston | TX | 12/5/2008 |
| Alexan McKinney Ranch | | 379 | apts | McKinney | TX | 12/9/2008 |
| | | | | | | |
| to be complete 12/31/08 | | 9,341 | | | | |

20

## APPENDIX 3

### Form of Property Alteration Agreement

### *PROPERTY ALTERATION AGREEMENT*

*[This form to be customized by experts to delineate model types and other property-specific information.]*

*[Complex Name and Address]*

This Property Alteration Agreement (this "Agreement"), dated as of
_____, 200\_\_, is entered into by and among Trammell Crow Residential
Company ("TCR") and the Equal Rights Center, a not-for-profit corporation (the
"ERC"), with respect to [ Property Name and Location ] (the "Property"). A site plan is
attached hereto as **Exhibit A.**

### RECITALS

WHEREAS, TCR and the ERC (collectively, the "Parties") have entered into a
Consent Decree (the "Consent Decree") which provides, among other things, that the
Parties will agree upon alterations (the "Alterations") to be made to certain properties
with which TCR has been involved, and

WHEREAS, a survey has been conducted of the Property, and

WHEREAS, the Parties desire to enter into an agreement concerning Alterations
to be made at the Property,

NOW THEREFORE, pursuant to the terms of the Consent Decree, the Parties
agree as follows:

**I.      General Provisions**

A.      Release. Upon completion, inspection and certification of the Alterations
in accordance with this Agreement, the ERC will provide the Release specified in
Paragraph E. 1 of the Consent Decree. Provision of the Release will be conclusive
evidence of the satisfactory completion, inspection and certification of the Alterations in
accordance with this Agreement.

B.      Counterparts. This Agreement may be executed in counterparts, all of
which when taken together will constitute a single instrument.

**II.     Alterations to Public Areas:**

        1.      Issue:
         1.1.    Action:

21

2.    Issue:
    2.1.    Action:

III.    **Alterations to Common Areas:**

    1.  Issue:
        1.1. Action:

    2.  Issue:
        2.1.

IV.    **Alterations to Units:**

    1.  Issue:
        1.1. Action:

    2.  Issue:
        2.1. Action

EQUAL RIGHTS CENTER

By:_____

Name:_____

Title:_____

My commission expires:_____

TRAMMELL CROW RESIDENTIAL COMPANY

By:_____

Name:_____

Title:_____

DMEAST #10146135 v2

## APPENDIX 4

### Remediation Tolerances

With respect to the Remediation Properties, remediations will be made to one or more "safe harbors," selected by TCR, and modified as follows[2]:

a.   Thresholds: all thresholds, in units, having a vertical rise of more than ¼" but no more than ¾" will either be beveled or replaced with a conforming threshold. Thresholds having a vertical rise in excess of ¾" will be replaced with conforming thresholds.

b.   French Door Thresholds: vertical rise on French door threshold may, if ramped at a ratio of 1:12, be up to 1".

c.   Patio/Balcony Thresholds: at all patio and balcony thresholds having an interior vertical rise of more than ¼," but no more than 1" a ramping mechanism at 1:2 from ¼" to ¾", or at 1:12 from ¾" to 1", may be installed so as to make the doorway accessible to persons using wheelchairs. Thresholds with an interior vertical rise of more than 1" will be replaced with one meeting all other criteria of a safe harbor.

d.   Doors:

(i)   In the event that a door to an accessible bathroom is in compliance with the selected safe harbor, a second door to that same bathroom will not be required to be remediated;

(ii)   The interior door width requirement of 32" nominal (31.5") may be met through the use of offset hinges;

(iii)   Closets of 26" or lesser depth will not be required to meet 32" nominal width door requirements.

e.   Kitchens:

(i)   Clear floor space on sinks and applicable appliances may be off-center by up to 2";

---

[2] "Safe Harbor" means any of the following: a) ANSI A117.1 (1986); the Fair Housing Accessibility Guidelines (HUD, 1991); the Fair Housing Design Manual (1998); the Guidelines and Supplemental Questions and Answers (HUD, June 28, 1994); CABO/ANSI A117.1 (1992); ICC/ANSI A117.1(1998); the Code Requirements for Housing Accessibility (CRHA, 2000); the International Building Code (2000, with 2001 Supplement); the International Building Code (2003); the International Building Code (2006); and b) any other Safe Harbor recognized by HUD. To the extent TCR relies upon ANSI standards as a Safe Harbor, those standards shall be read in conjunction with the Fair Housing Act, HUD's regulations, and the HUD Fair Housing Accessibility Guidelines.

DMEAST #10146135 v2

(ii) In U-shaped kitchens, no remediation would be required if turning diameter is no less than 59". If diameter is less than 59" removable base cabinets sufficient to allow for "T-turns" would be sufficient;

(iii) In galley kitchens, no remediation would be required if the distance between the faces of the opposable elements (cabinets and appliances) is 39" or greater.

(iv) If the clear floor space is impinged by an appliance, the resident will be offered a smaller replacement appliance at no cost.

f. Switches, Outlets, and Environmental Controls:

(i) Maximum height of 49" and minimum height of 14", each measured to the centerline of, respectively, the higher or lower receptacle or an outlet or switch or the centerline of the highest operable control of the thermostat; if higher than 49", lower to 47" or lower, and if lower than 14" raise to 16" or above; and

(ii) Outlets over kitchen counters in inaccessible locations could remain if an equal number of outlets with comparable electrical capacity are provided in accessible locations within the same area. For purposes of this provision, the "same area" means that an accessible outlet is located within 36" or serves the same uninterrupted countertop as the inaccessible outlet, and is not within 32" of any corner.

g. Bathrooms (unless otherwise agreed upon):

(i) Clear floor space on sinks, toilet and tub may be off-center by up to 2";

(ii) Toilets at least 16" from the "grab bar" side wall and 14" from the "non-grab bar" side wall need not be repositioned. Off-set flanges may be used to reposition toilets requiring remediation;

(iii) countertop heights in unit bathrooms need not be altered if no higher than 35" AFF; and

(iv) wing-its may be used in lieu of cross-bracing as reinforcement for grab bars.

h. Mailboxes

(i) If the lower rows of mailboxes are less than 49" they will not need to be repositioned so long as any tenant with a disability is provided the option to be assigned (or moved to) a mailbox on a level below 48".

DMEAST #10146135 v2

i.  Common Use Areas:

   (i)   At least one route to the primary door and various parts of the clubhouse and leasing office must be "accessible" as defined by a recognized safe harbor;

   (ii)  reflective mirrors need not be altered if no more than 45" AFF, and mirror is tiltable:

   (iv)  signage need not be altered if it meets all other FHA and ADA criteria and is no more than 62" AFF measured to the center of the sign;

   (v)   grab bars for toilets need not be altered if no more that 35"- 37" AFF;

j.  Accessible Routes

   (i)   Site or legal constraints will be acknowledged as a basis to provide an accessible route to a secondary entrance;

   (ii)  Running Slopes and Cross Slopes: unless otherwise agreed to by the parties (a) walkways (excluding at entries and landings) need not be altered as to running slope if their running slope is 5.25% or less, and the walkways are otherwise FHA and ADA compliant. Walkway slopes above 5.25% will be altered to 5.00%, or will be considered ramps not walkways, and will have handrails on both sides except at curb ramps ; (b) ramps with running slopes of up to 8.75% (but complying with all other requirements for ramps) need not be altered. Ramps with running slopes above 8.75% will be altered to no more than 8.33%; (c) cross-slopes of walkways and ramps (but not at entries or landings) need not be altered as to cross-slope if the existing cross-slope is no greater than 4.00%, and the walkways and ramps are otherwise FHA and ADA compliant. Walkways and ramps with cross-slopes in excess of 4.00% will be altered to no more than 2.00%;

   (iii) accessible parking spaces need not be altered if they meet all other FHA and ADA requirements, and width is no less than 12';

   (iv)  handrail extensions need not be altered if they are no less than 11".

k.  Protruding Objects:  Sconces or other objects that protrude 5" or less as measured from the baseboards of the walls in hallways (if such baseboards are a uniform distance from the wall) or which are higher than 78" AFF and protrude any distance may remain.

-25-

1. <u>General Provisions</u>: The Parties recognize that some remediation efforts would be impossible or substantially burdensome balanced against the objectives of the FHA and ADA. In such circumstances, the parties will, in good faith, seek alternative accessibility modifications to mitigate the violation and maximize accessibility.

   (i.)    In no event shall TCR be required to move a load bearing wall or a wall that would include relocating plumbing, electrical panels, or an HVAC chase, or to install an elevator as part of a retrofit, or to provide any remediation under this paragraph 3 when no feasible alternative is identified.

   (ii.)   If, after negotiating in good faith to agree on alternative accessibility modifications under this provision, the Parties remain in disagreement, either party may promptly petition the Court for a determination as to the extent of the retrofit to be performed, or for a determination that no retrofit need be made.

   (iii.)  The applicability of this provision is limited to those situations in which a single alleged deficiency necessitates the retrofit with a substantial magnitude or burden. This provision does not apply in situations where the cumulative effect of several alleged deficiencies results in a substantial magnitude or burden for fixing a single unit, nor will it be applied to any alleged deficiency that causes a retrofit with a substantial magnitude or burden only because a retrofit is necessary for a large number of units.

- 26 -

## APPENDIX 5

### "Aging in Place" Design Features

The Parties agree that any to-be-built townhome or single family home containing the following "Aging in Place" design features may be substituted by TCR pursuant to paragraph 6.a.ii of the Consent Decree:

### Exteriors:

1. Deck, patio, or balcony surfaces no more than ½ inch below interior floor level if made of wood.

### Overall Floor Plan:

1. No steps between rooms/areas on the same level.
2. 5 x 5 foot clear/turn space in main living area, U-shaped kitchen, and one bedroom, and in one bathroom.
3. In galley kitchens, at least 40 inches between opposable elements.

### Hallways:

1. In units 20 feet wide or wider, hallways minimum of 36 inches wide, wider to be considered; 32 inches wide where hallway is 24 inches or less long.
2. Well lit.

### Entry:

1. Accessible path of travel to home, wherever reasonably possible.
2. At least one, no-step entry, wherever reasonably possible.
3. 32 inches of clear opening.
4. Non-slip flooring in foyer as option.
5. Entry door sidelight or high peep hole viewer; low peep hole viewer as option.
6. Doorbell, if any, in accessible location.
7. Levered door hardware.

### Thresholds:

1. Flush preferable.
2. Exterior maximum of ½ inch beveled.
3. Interior maximum of ¼ inch.

### Interior Doors:

- 27 -

    1.    32 inches of clear opening (this requires a 36 inch door).

    2.    Levered door hardware.

## Windows:

    1.    Easy to operate hardware

## Garage or Carport:

    1.    Handrail if steps.

    2.    Ramp to doorway if needed

## Faucets:

    1.    Lever handles

    2.    Thermostatic or anti-scald controls

    3.    Pressure balanced faucets

## Kitchen and Laundry:

    1.    Loop handles on kitchen cabinets and drawers that require handles (for cabinets or drawers that do not need handles, offer loop handles to buyer as option).

    2.    Upper wall cabinetry three inches lower than conventional height

    3.    Base cabinets with rollout trays and lazy susanes

    4.    Compliant spacing for at least one-half of electrical sockets in kitchens (46-inch AFF maximum height for side approach, 44-inch AFF with knee clearance for front approach, if over obstruction of less than 20-inch, 48-inch AFF).

    5.    Optional front-loading laundry machines with accessible controls where washers and dryers offered as an option.

    7.    30-inch by 48-inch clear space at appliances, or 60-inch diameter clear space for turns in U-shaped kitchens.

    8.    Pull-out spray faucet; levered handles.

## Bathrooms:

    1.    At least one wheelchair maneuverable bath on the entry level of the unit with acceptable turning space and 36-inch by 36-inch or 30-inch by 48-inch clear space.

    2.    Bracing in walls around tub, shower, shower seat, and toilet for installation of grab bars to support 250-300 pounds.

    3.    Central mixing valve for water control on standard bathtubs.

DMEAST #10146135 v2

4. Toilets with safe harbor compliant spacing from sidewalls in compliant bathroom floor plans.

**Stairways:**

1. Adequate hand rail on one side of stairway, 1 ¼-inch diameter.
2. In multi-story homes, either pre-framed shaft (e.g. stacked closets) for future elevator or stairway width minimum of 4 feet to allow for lift
3. Blocks or other support in walls for installation of chair lift if necessary for optional chair lift installation.

**Ramps:**

1. Slope no greater than 1-inch rise for each 12 inches in length, compliant/adequate handrails.
2. 5-foot landing provided at exterior accessible entrance.
3. 2-inch curbs or a railing for safety where required.

**Electrical:**

1. Light switches, thermostats, and other environmental controls placed in accessible locations - no higher than 48 inches to center of highest operable part and no lower than 15 inches to center of lowest operable part.
2. Audible and visual/strobe smoke detectors.
3. Rocker or touch light switches

**Flooring:**

1. Smooth, non-glare, non-slip surfaces interior and exterior as option.
2. If carpeted, low (less than ½ inch high pile) density, with firm pad as option.

- 29 -

## APPENDIX 6

### Form of Release For [Property Name]

The Equal Rights Center (and its affiliates, successors, or assigns) covenants and agrees that it will forever refrain from instituting, maintaining, prosecuting, or continuing to maintain or prosecute any suit or action or proceeding or assisting others with any suit or action or proceeding against Trammell Crow Residential Company, its subsidiaries and affiliates, and other entities or individuals which have or, in the past, had an ownership interest in [Property Name], or which had a role in the design or construction of [Property Name], as well as the officers, directors, managers, trustees, employees and agents of such entities or individuals and the respective successors and assigns of all of those herein, (collectively, the "TCR-Released Parties"), alleging claims under the Fair Housing Act Amendments of 1988 related to the design and construction of multifamily housing, the Americans with Disabilities Act, and any state or local accessibility law relating to [Property Name], except related to changes (other than those made pursuant to the Consent Decree) made after the survey, remediation if necessary and final inspection pursuant to the Equal Rights Center – Trammell Crow Residential Company Consent Decree.

- 30 -

## APPENDIX 7

### Joint Press Release

(Issued as a separate document)

DMEAST #10146135.v2